Chief Justice Roberts,
with whom
Justice Scalia, Justice Thomas, and Justice Alito join, dissenting*
A jury imposed a sentence of death in each of these cases, despite hearing mitigating evidence from the defendants about their troubled backgrounds. The convictions and sentences were upheld on direct review. On state collateral review, each defendant claimed that the jury instructions did not allow sufficient consideration of the mitigating evidence. This Court had considered similar challenges to the same instructions no fewer than five times in the years before the state habeas courts considered the challenges at issue here. See Jurek v. Texas, 428 U. S. 262 (1976); Franklin v. Lynaugh, 487 U. S. 164 (1988); Penry v. Lynaugh, 492 U. S. 302 (1989) (Penry I); Graham v. Collins, 506 U. S. 461 (1993); Johnson v. Texas, 509 U. S. 350 (1993). Four of the cases rejected the defendant’s challenge. Only one — Penry I— upheld it. The guidance the Court gave in these five cases on whether the jury instructions at issue allowed sufficient consideration of mitigating evidence amounted to — it depends. It depends on the particular characteristics of the evidence in a specific case. The state courts here rejected *266 the claim as applied to the particular mitigating evidence in these cases, and the defendants sought federal habeas review.
Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), however, a state-court decision can be set aside on federal habeas review only if it is “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U. S. C. §2254(d)(1). When this Court considers similar challenges to the same jury instructions five separate times, it usually is not because the applicable legal rules are “clearly established.” The Court today nonetheless picks from the five precedents the one that ruled in favor of the defendant — Penry 1 — and anoints that case as the one embodying “clearly established Federal law.” In doing so the Court fails to give any meaningful weight to the two pertinent precedents subsequent to Penry I— Graham and Johnson — even though those cases adopted a more “limited view” of Penry I than the Court embraces today. Johnson, supra, at 365. Indeed, the reading of Penry I in Graham and Johnson prompted every one of the remaining Justices who had been in the majority in Penry I on the pertinent question to dissent in Graham and Johnson, on the ground that the Court was failing to adhere to Penry I.
I suppose the Court today is free to ignore the import of Graham and Johnson on the question of what Penry I means, but in 1999 or 2001, respectively — when petitioners were denied collateral relief — the state courts did not have that luxury. They should not be faulted today for concluding — exactly as the Graham and Johnson dissenters did— that the Court had cut back significantly on Penry I.
We give ourselves far too much credit in claiming that our sharply divided, ebbing and flowing decisions in this area gave rise to “clearly established” federal law. If the law were indeed clearly established by our decisions “as of the *267 time of the relevant state-court decision,” Williams v. Taylor, 529 U. S. 362, 412 (2000), it should not take the Court more than a dozen pages of close analysis of plurality, concurring, and even dissenting opinions to explain what that “clearly established” law was. Ante, at 246-260. When the state courts considered these cases, our precedents did not provide them with “clearly established” law, but instead a dog’s breakfast of divided, conflicting, and ever-changing analyses. That is how the Justices on this Court viewed the matter, as they shifted from being in the majority, plurality, concurrence, or dissent from case to case, repeatedly lamenting the failure of their colleagues to follow a consistent path. Whatever the law may be today, the Court’s ruling that ’twas always so — and that state courts were “objectively unreasonable” not to know it, Williams, supra, at 409 — is utterly revisionist.
I
In 1987, Jalil Abdul-Kabir — referred to by his given name, Ted Calvin Cole, throughout this opinion, ante, at 237, n. 1— was convicted of capital murder after he confessed to strangling 66-year-old Raymond Richardson with a dog leash to steal $20 from him. Among the 21 claims Cole raised on state collateral review was a challenge under Penry I, supra, to the application of Texas’s special issue jury instructions. In evaluating Cole’s challenge, the state habeas trial court stated:
“The issue is whether the sentencing jury had been unable to give effect to [Cole's] mitigating evidence within the confines of the statutory 'special issues.’ While [Penry I] held that evidence of a defendant’s mental retardation and abused childhood could not be given mitigating effect by a jury within the framework of the special issues, the cases that followed such as Graham v. Collins, [506 U. S. 461] (1993), Garcia v. State, 919 S. W. 2d 370 (1996), Mines v. State, 888 S. W. 2d 816 *268 (1994), and Zimmerman v. State, 881 S. W. 2d 360 (1994) held that the mitigating evidence of alcoholism, drug abuse, bad family background, bipolar disorder, low I.Q., substance abuse, head injury, paranoid personality disorder and child abuse were sufficiently considered under the special issues. The issue of whether the mitigating evidence can be sufficiently considered must be determined on a case by case basis, depending on the nature of the mitigating evidence offered and whether there exists other testimony in the record that would allow consideration to be given.” App. in No. 05-11284, pp. 159-160.
Applying that standard, the state court concluded that “[t]he evidence presented at the punishment stage of the trial, especially evidence from [Cole’s] expert witnesses, provided] a basis for the jury to sufficiently consider the mitigating evidence.” Id., at 161. The Texas Court of Criminal Appeals adopted the trial court’s findings without substantive comment, and denied Cole’s application for habeas corpus relief on November 24, 1999. Id., at 178-179.
In finding that the state court’s decision was objectively unreasonable, the Court begins by stating that the principle the state court violated was “firmly established,” based on “[a] careful review of our jurisprudence in this area.” Ante, at 246. The only thing clear about our jurisprudence on the pertinent question in 1999, however, is that it was unsettled and confused.
In Jurek, the Court upheld Texas’s use of the special issues as facially constitutional, with the controlling opinion noting that “the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of particularized mitigating factors.” 428 U. S., at 272 (joint opinion of Stewart, Powell, and Stevens, JJ.). In so doing, Jurek left open the possibility that some mitigating evidence might not be within the reach of the jury under the special issues; other types of mitigating evidence, of course, would *269 be. Cf. id., at 272-273 (suggesting that the future dangerousness special issue allowed the jury to consider prior criminal conduct, age, duress, and whether the defendant was under extreme mental pressure).
The next occasion the Court had to consider mitigating evidence under the Texas special issues arose in Franklin, in which the Court concluded that the defendant’s mitigating evidence of good behavior in prison was taken into account under the future dangerousness special issue. 487 U. S., at 178-179 (plurality opinion); id., at 186-187 (O’Connor, J., concurring in judgment). A plurality of the Court also rejected the argument that a jury must be permitted to give “independent” effect to mitigating evidence — beyond the special issues — concluding that “this submission is foreclosed by Jurek” and rejecting the dissent’s argument to the contrary. Id., at 179-180, and n. 10; see also id., at 199-200 (Stevens, J., dissenting).
The Court today places great weight on the opinion by Justice O’Connor concurring in the judgment in Franklin, an opinion joined only by Justice Blackmun. Ante, at 251-254. That separate opinion expressed “doubts” about the plurality’s view that mitigating evidence need not be given effect beyond the special issues, noting that if the petitioner in Franklin had introduced evidence not covered by the special issues, “we would have to decide whether the jury’s inability to give effect to that evidence amounted to an Eighth Amendment violation.” 487 U. S., at 183, 185. The separate opinion concluded, however, that “this is not such a case.” Id., at 185. According to the Court today, a discerning state judge should have seen that federal law was “clearly established” on the point by the concurring and dissenting opinions, not the plurality. Ante, at 251-254.
Penry I, decided the following Term, concluded that in that case the Texas instructions did not allow the jury to give mitigating effect to evidence of Penny's mental retardation and abusive childhood. 492 U. S., at 328, 315 (“Penry *270 does not.. . dispute that some types of mitigating evidence can be fully considered by the sentencer in the absence of special jury instructions. Instead, Penry argues that, on the facts of this case, the jury was unable to fully consider and give effect to the mitigating evidence ... in answering the three special issues” (emphasis added; citations omitted)). In granting relief, the Court, quoting the Franklin concurrence, noted that Penry’s evidence “‘had relevance to [his] moral culpability beyond the scope of the special verdict questions,’ ” 492 U. S., at 322 (quoting 487 U. S., at 185 (O’Connor, J., concurring in judgment); some alterations deleted), and that it was relevant to the special issues “only as an aggravating factor,” 492 U. S., at 323 (emphasis in original). According to the Court today, the views of the Franklin concurrence and dissent were thus elevated to the opinion of the Court in Penry I, again clearly establishing federal law. Ante, at 252-254, and n. 15. The four dissenters in Penry I complained that the Court’s holding “flatly contradicted]” Jurek, and that in finding a constitutional violation, the Court was “throwing away Jurek in the process.” 492 U. S., at 355, 354 (Scalia, J., concurring in part and dissenting in part).
A state court looking at our pertinent precedents on the Texas special issue instructions would next have to consider the significance of Saffle v. Parks, 494 U. S. 484 (1990). That case — issued less than nine months after Penry I — considered Oklahoma instructions, but extensively analyzed Penry I in doing so. See 494 U. S., at 491-492. The Court concluded that the mitigating evidence in that case could be adequately considered by the jury under the instructions given. The four dissenters in Saffle — including the author of today’s opinion — complained that the majority’s discussion of Penry I was “strangely reminiscent” of the position of the Penry I dissenters. 494 U. S., at 504 (opinion of Brennan, J.). The Saffle dissenters asserted that the majority’s failure to reject the position of the Penry I dissenters “creates considerable *271 ambiguity about which Lockett [v. Ohio, 438 U. S. 586 (1978)] claims a federal court may hereafter consider on habeas corpus review.” 494 U. S., at 504-505.
In Graham, decided three years later, the Court sought to clarify the interplay between Jurek, Franklin, and Penry I:
“It seems to us, however, that reading Penry as petitioner urges — and thereby holding that a defendant is entitled to special instructions whenever he can offer mitigating evidence that has some arguable relevance beyond the special issues — would be to require in all cases that a fourth ‘special issue’ be put to the jury: ‘ “Does any mitigating evidence before you, whether or not relevant to the above [three] questions, lead you to believe that the death penalty should not be imposed?” ’ The Franklin plurality rejected precisely this contention, finding it irreconcilable with the Court’s holding in Jurek, and we affirm that conclusion today." 506 U. S., at 476-477 (citation omitted; second emphasis added).
Thus, in Graham the Court rejected the reading of Franklin and Penry 1 that the Court today endorses, reasoning that it would require a new sentencing in every case, and would be impossible to square with Jurek.[1]
Although the Court today tells us it was clear that the applicable federal law was established by the Franklin concurrence and dissent, and that Penry I had to be read in that light, ante, at 252-254, the Court majority in Graham specifically relied instead upon the Franklin plurality in re *272 jecting the same broad reading of Penry I the Court resuscitates today, nunc pro tunc. Graham, supra, at 476-477. The dissenters in Graham — including every remaining Member of the Penry I majority — were adamant that Penry I should have been controlling in Graham. See, e.g., 506 U. S., at 507 (opinion of Souter, J., joined by Blackmun, Stevens, and O’Connor, JJ.) (“Our description of Penry’s claim applies . .. almost precisely to Graham’s claim”); id., at 508 (“[Graham’s] position is identical to that of Penry”); id., at 512 {“Penry controls in this respect, and we should adhere to it”); id., at 520 (“[T]he case is controlled by Penry”). The issue is not whether the majority or the dissenters in Graham were right about how to read Penry I, but whether it was reasonable for a state court in 1999 to read it the way the majority in Graham plainly did.
Later the same Term, in Johnson, the Court reaffirmed the “limited view of Penry” it had adopted in Graham. 509 U. S., at 365. Once again the Court majority specifically relied on the Franklin plurality — not the concurrence and dissent. See 509 U. S., at 370-371. And once again the dissenters — including every remaining Member of the Penry I majority — lamented the Court’s asserted failure to adhere to Penry I. 509 U. S., at 385-386 (opinion of O’Connor, J., joined by Blackmun, Stevens, and Souter, JJ.). The dissent — by the Penry I author — made precisely the same point made by the Court today about how to read the Franklin concurrence and dissent. 509 U. S., at 385-386. The difference, of course, was that in Johnson the point was made in dissent. It cannot have been “objectively unreasonable” for a state court, in 1999, to have been guided by the Johnson majority on this question, rather than by the dissent.
In short, a state court reading our opinions would see an ongoing debate over the meaning and significance of Penry I. That state court would see four dissenters in Graham and Johnson — including every remaining Member of the Penry I majority — arguing that the Court was failing to fol *273 low or sharply limiting Penry I in those cases. On the flip side, the state court would see four dissenters in Penry I— every one later joining the majorities in Graham and Johnson — suggesting that the Penry I majority departed from Jurek. It is in that context that the Court today tells us that the state courts should have regarded Penry I as “clearly established Federal law, as determined by the Supreme Court of the United States.” § 2254(d)(1).
The Court asserts that Graham and Johnson did not “disturb the basic legal principle” at issue, ante, at 259, and that we cite no post-Penry I cases inconsistent with its reading of that case, ante, at 253, n. 14. I do not understand how the author of today’s opinion can say that Graham did not disturb the principle of Penry I, however, when he joined a dissent in Graham stating that “[Graham’s] position is identical to that of Penry” and that Graham’s case “is controlled by Penry.” 506 U. S., at 508, 520 (opinion of SOUTER, J.) (emphasis added). That would seem to suggest that Graham was inconsistent with Penry I. I do not understand how the author of today’s opinion can say that Johnson had no effect on Penry I, when he joined a dissent in Johnson stating that the majority opinion “upset our settled Eighth Amendment jurisprudence.” 509 U. S., at 382 (opinion of O’Connor, J.). Now Johnson is dismissed as just an application of “basic legal principle^],” over which Justices can disagree, ante, at 259; back then it “upset our settled Eighth Amendment jurisprudence.” And what of Safflel There the author of today’s opinion joined a dissent claiming that the majority was adopting the rule rejected in Penry I. 494 U. S., at 504 (opinion of Brennan, J.). Again, that would seem to suggest inconsistency with Penry I.[2]
*274 In fact, Penry I is not even consistent with the reading the Court ascribes to it — in that case the Court concluded that a jury could only view Penry’s mitigating evidence as aggravating, and thus could not give the evidence any mitigating effect. 492 U. S., at 323 (Penry’s evidence was “relevant only as an aggravating factor” (emphasis in original)); see also Graham, supra, at 473 (“Although Penry’s evidence of mental impairment and childhood abuse indeed had relevance to the ‘future dangerousness’ inquiry, its relevance was aggravating only” (emphasis in original)). The Court concedes that Cole’s evidence in the present case was not purely aggravating, see ante, at 259 (“[T]he jury could give mitigating effect to some of the experts’ testimony”), thus drawing into even starker contrast the rule that was established by a fair reading of Penry I in 1999 versus the rule the Court today reads Penry I to have “clearly established.”
As might be expected in light of the foregoing, judges called upon to apply these precedents were confused by the ambiguity of this Court’s pronouncements. See, e. g., Mines v. Texas, 888 S. W. 2d 816, 820 (Tex. Crim. App. 1994) (Baird, J., concurring) (“The Supreme Court’s holdings in Penry, Graham and Johnson do not provide an analytical framework to determine when our capital sentencing scheme fails to allow the jury to consider and give effect to mitigating evidence . . . ”); see also Brewer v. Dretke, 442 F. 3d 273, 279, n. 16 (CA5 2006) (per curiam) (remarking, in applying Graham and Penry I, that “[tjhere is no easy way to locate [the defendant] at either pole”). Commentators at the time likewise concluded that Graham and Johnson “put a cap on Penry’s principles.” Denno, Testing Penry and Its Progeny, *275 22 Am. J. Crim. L. 1, 10 (1994) (“In Graham, the Court made clear that it did not interpret Penry ‘as effecting a sea change’ in its evaluation of the constitutionality of the former Texas death penalty statute... ”). See also Twenty-Eighth Annual Review of Criminal Procedure, 87 Geo. L. J. 1756, 1770 (1999) (“The possible reach of Penry has been circumscribed by [Graham] and [Johnson]”).
It is a familiar adage that history is written by the victors, but it goes too far to claim that the meaning and . scope of Penry I was “clearly established” in 1999, especially in the wake of Graham and Johnson. In applying AEDPA, we have recognized that “[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous.” Mitchell v. Esparza, 540 U. S. 12,17 (2003) (per curiam); see also Lockyer v. Andrade, 538 U. S. 63, 72-73 (2003) (declining to find federal law “clearly established” when “our precedents in [the] area have not been a model of clarity”).
When the state court rejected Cole’s claim, it knew that mitigating evidence of mental retardation and severe childhood abuse could not be given effect under the special issues, Penry I, 492 U. S., at 328, but that evidence of youth and a transient upbringing could be, Graham, supra, at 476; Johnson, supra, at 368. The court concluded that Cole’s mitigating evidence — a troubled childhood and “impulse control” disorder — was more like that considered in Johnson and Graham than in Penry I. And because Cole’s mitigating evidence was not as troubling as that at issue in Penry I, the state court did not act unreasonably in concluding that the collateral damage of his upbringing and impulse control disorder would, like youth in Johnson, dissipate over time, so that Cole would be less of a danger in the future. It is irrelevant that the ill effects of Cole’s upbringing and impulse control disorder might not wear off for some time — there was no suggestion in Johnson that the petitioner in that case would become less dangerous any time soon.
*276 In other words, our precedents — which confirmed that the permanence of a mitigating feature was highly relevant, and that the correct answer was a case-specific matter turning on the particular facts — did not provide a clear answer, because the particular evidence before the court fell somewhere between the guideposts established by those precedents. As we have recognized, “the range of reasonable judgment can depend in part on the nature of the relevant rule. . . . [Some] rules are more general, and their meaning must emerge in application over the course of time.” Yarborough v. Alvarado, 541 U. S. 652, 664 (2004). See also Brown v. Payton, 544 U. S. 133, 143 (2005) (reviewing state-court application of Supreme Court precedent “to similar but not identical facts” and concluding that “[e]ven on the assumption that its conclusion was incorrect, it was not unreasonable, and is therefore just the type of decision that AEDPA shields on habeas review”).
The state court’s approach to the question was plainly correct; indeed, we engaged in a similar comparison in Graham itself in determining that the evidence presented in that case was cognizable under the special issues:
“Jurek is reasonably read as holding that the circumstance of youth is given constitutionally adequate consideration in deciding the special issues. We see no reason to regard the circumstances of Graham’s family background and positive character traits in a different light. Graham’s evidence of transient upbringing and otherwise nonviolent character more closely resembles Jurek’s evidence of age, employment history, and familial ties than it does Penry’s evidence of mental retardation and harsh physical abuse.” 506 U. S., at 476.
The state court thought that Cole’s evidence “more closely resemble[d]” Johnson and Graham than Penry I. That cannot be said to be “contrary to, or... an unreasonable applica *277 tion of, clearly established Federal law.” § 2254(d)(1). See Brown, supra, at 143, 147; Williams, 529 U. S., at 411.
The Court further holds that the jury instructions did not permit Cole’s evidence to have “mitigating force beyond the scope of the special issues,” ante, at 257, as it now reads Penry I to require. At the time the state court ruled, however, Graham and Johnson, decided after Penry I, had expressly rejected the notion that a jury must “be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant,” so long as the jury could consider “in some manner all of a defendant’s relevant mitigating evidence.” Johnson, 509 U. S., at 372-373. The state court found that Cole’s mitigating evidence could be “sufficiently eonsider[ed]” by the jury “within the confines of the statutory ‘special issues,’ ” App. in No. 05-11284, at 161, 159, a holding consistent with this Court’s precedents as of 1999 — and certainly not contrary to clearly established federal law.
In reaching today’s result, the Court also takes advantage of eight years of hindsight and relies on three cases that postdate the state court’s ruling. Ante, at 263 (citing Penry v. Johnson, 532 U. S. 782 (2001) (Penry II), Tennard v. Dretke, 542 U. S. 274 (2004), and Smith v. Texas, 543 U. S. 37 (2004) (per curiam)). What is pertinent under AEDPA, however, is whether federal law was clearly established by our decisions when the state court acted. Williams, supra, at 412.[3] AEDPA requires state courts to reasonably apply *278 clearly established federal law. It does not require them to have a crystal ball.
II
In 1991, petitioner Brent Ray Brewer was convicted of murder committed during the course of a robbery. Like Cole, Brewer claims that the Texas special issues prevented the jury from giving effect to mitigating evidence that he suffered from depression and had been abused as a teenager. The Texas courts rejected these claims on both direct and collateral review.
In evaluating Brewer’s claim, the Court focuses on the so-called “two-edged sword” nature of the evidence found to be beyond the jury’s reach in Penry I, and concludes that Brewer’s mitigating evidence is similarly double edged. The state court distinguished Penry I, however, stating that “a stay in a mental hospital does not evidence a long term mental illness which would affect appellant’s ability to conform to the requirements of society,” App. in No. 05-11287, p. 141 (internal quotation marks omitted), in contrast to Penry’s “organic brain disorder ... which made it impossible for him to appreciate the wrongfulness of his conduct or to conform his conduct to the law,” Penry I, 492 U. S., at 309. The state court determined that the nature of Brewer’s evidence allowed the jury to find that he would not be a future danger, whereas Penry’s did not.
The Court rejects this distinction, noting that while Brewer’s mitigating evidence may have been less compelling than Penry’s, “that difference does not provide an acceptable justification for refusing to apply the reasoning in Penry I to this case.” Brewer v. Quarterman, post, at 293, and n. 5. This misses the point. The state court’s distinction goes not to the relative strength of the mitigating evidence, but rather its character — an episodic rather than permanent *279 mental disorder. As discussed in the context of Cole, see supra, at 276, the distinction was not a “refus[al] to apply the reasoning in Penry I,” Brewer, post, at 293, but rather an application of Penry I that can hardly be said to be “objectively unreasonable” based on this Court’s decisions as of 2001. Indeed, in considering future dangerousness, it is difficult to imagine a more pertinent distinction than whether a mental condition is or is not permanent.
The Court concedes that “[t]he transient quality of [Brewer’s] mitigating evidence may make it more likely to fall in part within the ambit of the special issues,” and yet still finds the state court’s decision unreasonable because the evidence may have had relevance beyond the special issues. Brewer, post, at 294. As in Cole’s case, this conclusion squarely conflicts with the Court’s rejection in Graham of the proposition that “a defendant is entitled to special instructions whenever he can offer mitigating evidence that has some arguable relevance beyond the special issues.” 506 U. S., at 476 (emphasis in original). That rejection was confirmed in Johnson, see 509 U. S., at 372-373 (rejecting a rule that “would require that a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant” in favor of the rule “that a jury be able to consider in some manner all of a defendant’s relevant mitigating evidence”). Once again, the Court rejects the state court’s reasonable reading of existing cases in favor of its own revisionist reading of this Court’s doctrine, heavily informed by subsequent decisions that the state court had no means to predict.
Ill
In AEDPA, Congress “work[ed] substantial changes” to the power of federal courts to grant habeas corpus relief. Felker v. Turpin, 518 U. S. 651, 654 (1996). In today’s decisions, the Court trivializes AEDPA’s requirements and overturns decades-old sentences on the ground that they were contrary to clearly established federal law at the time — even *280 though the same Justices who form the majority today were complaining at that time that this Court was changing that “clearly established” law.
Still, perhaps there is no reason to be unduly glum. After all, today the author of a dissent issued in 1988 writes two majority opinions concluding that the views expressed in that dissent actually represented “clearly established” federal law at that time. So there is hope yet for the views expressed in this dissent, not simply down the road, but tunc pro nunc. Encouraged by the majority’s determination that the future can change the past, I respectfully dissent.

 In evaluating the state court’s analysis, the Court criticizes its reliance on Graham because Graham primarily addressed retroactivity under Teague v. Lane, 489 U. S. 288 (1989). Ante, at 258. But in considering whether the rule requested was dictated by precedent, Graham of course had to evaluate the scope of that precedent — including Penry I — and did so extensively. See 506 U. S., at 467-477. Moreover, as explained below, the Court in Johnson v. Texas, 509 U. S. 350, 370-372 (1993), adopted the same reading of Penry I adopted in Graham, without considering the issue under Teague.

 The Court is correct that “[w]hat is most relevant under AEDPA . . . is the holdings set forth in majority opinions, rather than the views of dissenters ... at the time those opinions were written.” Ante, at 260, n. 22. But that must include the majority opinions in all the pertinent eases, not just the lone one of the bunch that ruled in favor of the defend *274 ant. Here it must indude the subsequent majority opinions in Sajfle, Graham, and Johnson, as well as in Penry I, and it was not objectively unreasonable for a state court to view Sajfle, Graham, and Johnson the same way today’s author did at the time — or at least to conclude that the Court’s current view of Penry I was not as dearly established as the Court would have it today.

 The Court criticizes this dissent for failing “to define the rule” that our post-Penry I cases either did or should have applied. Ante, at 260, n. 22. But the whole point is that “the rule,” far from being “clearly established” by our decisions, was — at the very least — unsettled and confused. Under AEDPA, those defending the finality of a state-court judgment challenged on federal habeas review do not have to show that the state-court judgment was consistent with some version of “clearly established Federal law” other than that offered by the challenger; AEDPA obviously contemplates that there may not be “clearly established Federal law.” The *278 Court’s criticism only underscores how far the reasoning employed today strays from AEDPA’s mandate.